UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| WALTER J. QUEEN, et al., | ) | CASE NO. 5:16-cv-2262 |
| | ) | |
| PLAINTIFFS, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| HUNTER'S MANUFACTURING | ) | |
| COMPANY, INC., | ) | |
| | ) | |
| DEFENDANT. | ) | |

Before the Court is defendant's motion for summary judgment. (Doc. No. 50/51 ["Mot"].) Plaintiff has filed his opposition (Doc. No. 58 ["Opp'n"]) and defendant has filed a reply (Doc. No. 59 ["Reply"]). For the reasons set forth herein, the motion is **granted**.

**I.     BACKGROUND**

Plaintiff Walter J. Queen ("Queen") filed a complaint (which was amended) against defendant Hunter's Manufacturing Company, Inc., d/b/a TenPoint Crossbow Technologies ("TenPoint") asserting claims of strict products liability and negligence based on allegations that a crossbow manufactured, marketed, and distributed by TenPoint was defective due to failure to warn and/or defective design. Jurisdiction is based on diversity of citizenship.

On September 22, 2015, Queen, a 73-year-old resident of Kentucky (Doc. No. 51-1, Deposition of Walter J. Queen ["Queen Dep."] at 366 (6–7)[1]), purchased a used Titan HLX crossbow (the "crossbow")[2] on Craigslist from a private individual whose name he cannot recall.

---
[1] Page number references are to the page identification number generated by the Court's electronic docketing system. Where depositions have four pages per sheet, the actual page number is indicated in parentheses following the page identification number.

[2] Plaintiff did not know the age of the crossbow, but "[i]t seemed [to him] to be well taken care of." (Queen Dep. at 373 (36).)

(*Id*. at 373 (34, 36); Doc. No. 51-5, Plaintiff's Objections and Answers to TenPoint's First Set of Interrogatories at 410, No. 9.) The crossbow (Serial No. D81636) was built by TenPoint on March 26, 2009, and was thereafter shipped out of TenPoint by no later than June 29, 2009. (Doc. No. 51-2, Declaration of Sabrina Simon[3] ["Simon Decl."] ¶¶ 6–7 & Exs. 1, 2.)

The crossbow came in a case, with some arrows (called "bolts") and the crank handle for the cocker. It was not accompanied by any instruction manuals. Queen did not ask for the manuals or attempt to obtain any and, in fact, has never read the crossbow's instruction manual. (Queen Dep. at 374 (37–38); 376 (47).) The seller showed Queen "how to cock it, how to load it." (*Id.* at 374 (38).) The seller did not indicate that he had had any problems with the crossbow; he was selling it because his son, for whom it had been purchased, no longer had an interest in it. (*Id*. 374 (38–39).) When Queen was asked about what he particularly liked about the crossbow, he answered, "the price." (*Id.* (40).)

Prior to this purchase, Queen had never used a crossbow; he had only hunted with a rifle and a shotgun. (*Id.* at 371–72 (28–29).) In July or August 2015, Queen visited a Bass Pro Shop, where he "shot some crossbows[,]" because he "wanted to get a sense of what would be the best choice." (*Id*. at 372 (29–30).) Queen also researched different brands of crossbows on the internet. (*Id*. at 373 (34).) Although he does not recall whether he went to TenPoint's website, he did read a "lot of forums" where users expressed their "opinions on . . . particular bows." (*Id.* at 373 (34–35).) Comments about the TenPoint crossbow were "favorable," meaning "that they seemed to work for the people successfully." (*Id*. at 373 (35).)

---

[3] Simon is the Executive Projects Manager at TenPoint. (Simon Decl. ¶1.)

On September 26, 2015, Queen went hunting with the crossbow for the first time. (*Id*. at 377–78 (52–53).) When he returned home, he attempted to de-cock the crossbow by shooting a practice arrow into the ground in his backyard. He does not recall anyone ever showing him how to de-cock a crossbow; he just "figured" how to do it. (*Id*. at 380–81 (64–65).) As he pulled the trigger on the crossbow, he "thought [his] thumb was clear of the bow string," but it was not and "[his] thumb took the full blow of the string." (*Id.* at 381 (67–68).) Queen, thinking he had "just cut [his] thumb off," had his wife immediately drive him to a nearby emergency room. (*Id*. at 381–82 (68–69).)

After his accident, Queen conducted "a pretty extensive review[,]" unlike his pre-accident "cursory review[,]" and learned that TenPoint offered a GripGuard™ for the Titan HLX crossbow, which he then obtained. (*Id*. at 382 (71–72).) But he has never used it because he has not used the crossbow since his injury. (*Id*. (72).)

At the time the crossbow was first sold to the distributor, there was a warning tag affixed to it warning of "almost certain[] . . . injur[y] [to] the protruding digits[]" if the user were to "allow the fingers or thumb of [the user's] foregrip hand to inch above the top surface ('flight deck') of the barrel." (Doc. No. 51-6, TenPoint's Second Supplemental Answers and Objections to Plaintiff's First Set of Interrogatories at 423, No. 8; Doc. No. 51-7, Fingers/Thumb Injury Warning.) There is no dispute that Queen never saw this tag.

The Owner's Manual for the crossbow states: "Never allow your fore-grip hand's fingers or thumb to move above the barrel's flight deck or into the bow string or cables' release path (see earlier photos 1, 2, 3, & 4). If you do, you will injure yourself severely when you fire your crossbow." (Doc. No. 51-8, Owner's Manual at 441.) There is no dispute that Queen never saw

3

the Owner's Manual; however, when questioned about this particular warning during his deposition, Queen stated that he "knew and appreciated" it. (Queen Dep. at 383 (75).)

Queen also testified that it was "common sense" that a finger in the path of the string of a crossbow during firing could be injured. (*Id*. at 376 (47–48).) He acknowledged that "[i]f [his] thumb had been clear of the string, it wouldn't have been injured." (*Id*. at 392 (109).) He further acknowledged that it was his responsibility to know how to use the crossbow properly and safely. (*Id*. at 382 (69).)

## II. SUMMARY JUDGMENT STANDARD

When a party files a motion for summary judgment, it must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record . . .; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the nonmoving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970); *White v. Turfway Park Racing Ass'n, Inc.*, 909 F.2d 941, 943–44 (6th Cir. 1990), *impliedly overruled on other grounds by Salve Regina Coll. v. Russell*, 499 U.S. 225, 111 S. Ct. 1217, 113 L. Ed. 2d 190 (1991). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary

standards. Thus, in most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [nonmoving party] is entitled to a verdict[.]" *Id*. at 52.

"Once the moving party has presented evidence sufficient to support a motion for summary judgment, the nonmoving party is not entitled to trial merely on the basis of allegations; significant probative evidence must be presented to support the complaint." *Goins v. Clorox Co*., 926 F.2d 559, 561 (6th Cir. 1991). The party opposing the motion for summary judgment may not rely solely on the pleadings but must present evidence supporting the claims asserted by the party. *Banks v. Wolfe Cty. Bd. of Educ*., 330 F.3d 888, 892 (6th Cir. 2003); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) (finding that summary judgment is appropriate whenever the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial). Moreover, conclusory allegations, speculation, and unsubstantiated assertions are not evidence, and are not sufficient to defeat a well-supported motion for summary judgment. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990). In other words, to defeat summary judgment, the party opposing the motion must present affirmative evidence to support his or her position; a mere "scintilla of evidence" is insufficient. *Bell v. Ohio State Univ*., 351 F.3d 240, 247 (6th Cir. 2003). Rule 56 further provides that "[t]he court need consider only" the materials cited in the parties' briefs. Fed. R. Civ. P. 56(c)(3); s*ee also Street v. J.C. Bradford & Co*., 886 F.2d 1472, 1479–80 (6th Cir. 1989) ("The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact." (citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988))).

Under this standard, the mere existence of some factual dispute will not frustrate an otherwise proper summary judgment motion. *Dunigan v. Noble*, 390 F.3d 486, 491 (6th Cir. 2004)

5

(quotation marks omitted) (citing *Anderson*, 477 U.S. at 247–48). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

## III. DISCUSSION

### A. Choice of Law

With no citation to any statute other than 28 U.S.C. §§ 1332(a) and 1391(b) (the diversity jurisdiction and venue statutes), plaintiff's complaint sets forth two causes of action characterized as "strict products liability" and "negligence." There is no dispute that Ohio was the place of design and manufacture of the subject crossbow, whereas Kentucky was the place of plaintiff's injury. The Ohio Product Liability Act ("OPLA"), Ohio Rev. Code §§ 2307.71–2307.80, abrogates all common law products liability causes of action,[4] whereas the Kentucky Product Liability Act ("KPLA"), KRS §§ 411.300–411.350, does not. Under Kentucky law, a plaintiff may advance three different causes of action against a manufacturer: "(1) ordinary negligence, . . . ; (2) strict liability in tort, . . . ; and (3) contract liability for breach of warranty[.]" *Williams v. Fulmer*, 695 S.W.2d 411, 413 (Ky. 1985). The parties disagree as to which law applies—Kentucky's or Ohio's—although they agree that the outcome would be the same under both.[5]

---

[4] *LeBeau v. Lembo Corp.*, No. 5:06-CV-00502, 2008 WL 4317835, at *1 (N.D. Ohio Sept. 15, 2008) (quoting *125th General Assembly Amended Substitute Senate Bill 80 § 3(D)*) ("The General Assembly declares its intent that the amendment made by this act . . . is intended to . . . abrogate all common law product liability causes of action.").

[5] Queen argues that Ohio law applies, despite the fact that its application would preempt, at the very least, his second cause of action—common law negligence—and possibly even the first, since it pleads strict products liability but fails to cite to the Ohio Revised Code, much less to any particular section of the OPLA, instead referencing only Restatement (Second) of Torts Section 402A. (Doc. No. 7, Am. Compl. ¶ 53.). *See Delahunt v. Cytodyne Techs.*, 241 F. Supp. 2d 827, 844 (S.D. Ohio 2003) (requiring plaintiff to amend the negligence claim to clarify which section of the OPLA applied to it); *see also Williams v. Bausch & Lomb Co.*, No. 2:08-cv-910, 2009 WL 2983080, at *4 (S.D. Ohio Sept. 14, 2009) (citing *Delahunt* for the proposition that "[c]laims that are authorized by the Ohio Products Liability Act should be pled with reference to the applicable provision of the Act.").

6

"A federal court exercising diversity jurisdiction applies the choice of law rules of the state in which it sits." *Standard Fire Ins. Co. v. Ford Motor Co.*, 723 F.3d 690, 692 (6th Cir. 2013). Ohio has adopted the approach in the Restatement of Conflict of Laws, under which "'the law of the place of injury controls unless another jurisdiction has a more significant relationship to the lawsuit.'" *Pilgrim v. Universal Health Card, LLC*, 660 F.3d 943, 946 (6th Cir. 2011) (quoting *Morgan v. Biro Mfg. Co.*, 474 N.E.2d 286, 289 (Ohio 1984)).

> In determining the State with the most significant relationship, Ohio courts consider: (1) "the place of the injury"; (2) the location "where the conduct causing the injury" took place; (3) "the domicile, residence, . . . place of incorporation, and place of business of the parties"; (4) "the place where the relationship between the parties . . . is located"; and (5) any of the factors listed in Section 6 of the Restatement (Second) of Conflict of Laws "which the court may deem relevant to the litigation." [*Morgan*, 474 N.E.2d at 289.] The Section 6 factors include: "the relevant policies of the [State in which the suit is heard]," "the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue," "the basic policies underlying the particular field of law," "certainty, predictability and uniformity of result" and "ease in the determination and application of law to be applied." *Id.* at 289 n.6 (internal quotation omitted).

*Pilgrim*, 660 F.3d at 946.

Another branch of this court has observed that Ohio's choice-of-law principles regard place of injury as "the most important" factor. *Byers v. Lincoln Elec. Co.*, 607 F. Supp. 2d 840, 850 (N.D. Ohio 2009); *see also Lichoff v. CSX Transp., Inc.*, 218 F.R.D. 564, 573 (N.D. Ohio 2003) ("In a tort dispute, the law of the state in which the place of injury occurred usually controls[.]").

Here, Queen is a Kentucky resident who was injured in Kentucky. This fact carries great weight in the analysis. In addition, Queen purchased and used the crossbow in Kentucky, satisfying the second factor. Further, since he is alleging damages from failure to warn, this failure necessarily occurred "at the place where [he] could reasonably have been warned regardless of

7

where the decision not to warn took place." *Byers*, 607 F. Supp. 2d at 851 (internal quotation marks omitted).

The third factor weighs in neither party's favor, since each has a different residence. The Restatement remarks that "[t]he fact that the domicile and place of business of all parties are grouped *in a single state* is an important factor to be considered[,]" Restatement (Second) of Conflict of Laws § 145(2), cmt. e (Am. Law Inst. 1971), suggesting that where, as here, all parties are *not* in a single state, that factor has little or no weight.

Likewise, courts have observed that the fourth factor "is usually not relevant in a products liability action." *Byers*, 607 F. Supp. 2d at 851. In fact, "the language of § 145 [of the Restatement] makes allowance for the possibility that there will be *no* relationship between the parties by its use of the phrase 'if any.'" *Id.* (quotation marks omitted). Here, Queen and TenPoint had no relationship, since Queen purchased the crossbow from a third party.[6]

Kentucky law governs this case.

**B.    Analysis of Claims**

In Kentucky, products liability actions are governed by the KPLA, *Prather v. Abbott Labs.*, 960 F.Supp.2d 700, 705 (W.D. Ky. 2013), which applies "regardless of whether the action is founded on strict liability in tort, negligence or breach of warranty." *Monsanto Co. v. Reed*, 950 S.W.2d 811, 814 (Ky 1997). "[W]hen the claim is asserted against a manufacturer for deficient design of its product the distinction between the so-called strict liability principle and negligence is of no practical significance so far as the standard of conduct required of the defendant is

---

[6] The Section 6 factors add nothing to the analysis. "[They] do not counsel the selection of Ohio law in this case. [Kentucky] has a far greater interest in a lawsuit by one of its own injured citizens against a . . . manufacturer than does [Ohio]." *Wahl v. Gen. Elec. Co.*, 786 F.3d 491, 499 (6th Cir. 2015) (also noting that Ohio has a "default rule of the place of injury" and analyzes the Restatement factors "in light of the default rule").

8

concerned." *Nichols v. Union Underwear Co.*, 602 S.W.2d 429, 433 (Ky. 1980) (quotation marks omitted).

In addition, "Kentucky law recognizes three theories of products liability: (i) defective design, (ii) defective manufacture, and (iii) failure to warn." *Vaughn v. Konecranes, Inc.*, No. 5:14-136-DCR, 2015 WL 1719672, at *2 (E.D. Ky. Apr. 15, 2015).

Queen is pursuing claims of strict products liability and negligence under theories of failure to warn and defective design.

### 1. Presumption that Product is not Defective

TenPoint asserts that it is entitled to the following two statutory presumptions that the crossbow was not defective:

> (1) In any product liability action, it shall be presumed, until rebutted by a preponderance of the evidence to the contrary, that the subject product was not defective if the injury, death or property damage occurred either more than five (5) years after the date of sale to the first consumer or more than eight (8) years after the date of manufacture.
>
> (2) In any product liability action, it shall be presumed, until rebutted by a preponderance of the evidence to the contrary, that the product was not defective if the design, methods of manufacture, and testing conformed to the generally recognized and prevailing standards or the state of the art in existence at the time the design was prepared, and the product was manufactured

Ky. Rev. Stat. § 411.310.

The Kentucky statute relied upon by TenPoint is somewhat difficult to apply and there is little guidance in Kentucky case law. For example, TenPoint makes an argument, based on circumstantial evidence, that the injury occurred more than five years after the subject crossbow

was sold to the unknown original consumer and, therefore, the presumption applies.[7] It further argues that the crossbow was state-of-the art at the time it was first manufactured.[8]

In opposition, Queen argues that TenPoint has failed to support either of its arguments with direct evidence and, therefore, as it is "pure speculation by [TenPoint] that [p]laintiff's crossbow was sold less (sic) than 15 months after it was first shipped[,]" (Opp'n at 530), there can be no presumption. This seems like a reasonable (and predictable) counter-argument—that is, if TenPoint cannot establish the underlying requirements of either, or both, of the statutory subsections, then there is no presumption to rebut. But, in *Murphy by Murphy v. Montgomery Elevator Co.*, 957 S.W.2d 297 (Ky. Ct. App. 1997), the court seemed to render these underlying requirements superfluous by stating that the trial court had misinterpreted the statute (in a case brought under subsection (2)) when it ruled "that the presumption that the product was not defective would stand unless rebutted by evidence that the design, methods of manufacture, and testing did not conform to the state of the art in existence at that time." *Id*. at 299–300. The court of appeals stated that "the plain language of the statute . . . mean[s] that the presumption may be rebutted by evidence that the product was defective and *not that there must be evidence that the*

---

[7] TenPoint represents that, prior to May 2010, records were kept in handwritten logbooks, not electronically, in the regular course of its business. (Doc. No. 51-9, Declaration of Krista Preda ["Preda Decl."] ¶¶ 2, 3.) The logbook relating to the subject crossbow (Serial No. D81636) shows it was built on March 26, 2009—six and a half years before plaintiff's September 26, 2015 injury. (Simon Decl. ¶ 6 & Ex. 1 at 405.) The shipping logbook does not show an exact date when the subject crossbow was shipped out of TenPoint; however, all the 2009 Titan Series D crossbows were shipped out by June 29, 2009. (*Id*. ¶ 7 & Ex. 2 at 406.) Therefore, TenPoint concludes that the subject crossbow shipped by no later than June 29, 2009. There is no exact record of when the subject crossbow was sold to the first consumer, largely because Queen is unable to remember the name of that person, so that information is unable to be definitively ascertained. However, using its post-May-2010 electronic records, which include returned warranty cards stating the day, month, and year of purchase, TenPoint is able to approximate with some certainty that crossbows tend to be sold within no more than fifteen months after their shipment out of TenPoint. Therefore, according to TenPoint, it is likely that the first consumer purchased the subject crossbow within fifteen months of June 29, 2009, which is more than five years before Queen's injury. By this analysis, TenPoint claims it is entitled to the presumption that the crossbow was nondefective.

[8] TenPoint offers no evidentiary support of its conclusory assertion that the crossbow "represented the state of the art in the design and warnings relative to crossbows in 2009." (Mot. at 352.)

*design did not conform to prevailing standards or was not state of the art at that time.*" *Id.* at 300 (emphasis added).

Therefore, the only proper way for Queen to rebut the presumption is to produce evidence of the crossbow's defectiveness, not evidence or argument that the crossbow fell within the statutory timeframe of subsection (1) or that it was not state-of-the-art under subsection (2).[9] Queen seems to concede this fact. (*See* Opp'n at 531 (even if the presumption applies, "[p]laintiff has clearly established by a preponderance of the evidence that the crossbow in question was defective, thereby rebutting any presumption.")

Since, "[u]ltimately, '[t]he statutory presumptions . . . do no more than leave the burden of proof with [the plaintiff] to prove that the [product] was defective.'" *Miller v. Coty, Inc.*, No. 3:14-cv-00443-CRS, 2018 WL 1440608, at *8 (W.D. Ky. Mar. 22, 2018) (alterations in original) (quoting *Leslie v. Cincinnati Sub-Zero Prods., Inc.*, 961 S.W.2d 799, 802 (Ky. Ct. App. 1988)), the Court need not decide whether the presumption applies, but will simply evaluate whether Queen has met his burden to show defectiveness either due to lack of warnings or in design.

   2.   **Failure to Warn Claim**

Failure to warn claims are permitted under either strict liability or negligence. The two theories are "functional equivalents[,]" *Snawder v. Cohen*, 749 F. Supp. 1473, 1476 (W.D. Ky. 1990), because, "in either instance, the plaintiff must prove the product was defective and the legal cause of the injury." *McGuire v. Lorillard Tobacco Co.*, No. 2012-CA-000845-MR, 2014 WL 585626, at *10 (Ky. Ct. App. Feb. 14, 2014). "Whether analyzed under a negligence or a strict

---

[9] This seems to suggest that the Court should just assume that the *underlying* requirements of either or both presumption subsections have been met by defendant. The Court's own research has revealed no case where a defendant was required to prove facts underlying the presumption.

liability theory, the test used in evaluating warning issues is one of reasonableness." *Snawder*, 749 F. Supp. at 1476.

Here, although there are several elements that could be analyzed, since causation is dispositive it is the only element that need be addressed.

A plaintiff pursuing a products liability claim under either strict liability or negligence "bears the burden of establishing that the product was the factual and legal cause of [his] injuries." *Prather*, 960 F. Supp. 2d at 714. "[U]nder Kentucky law, causation or proximate cause is defined by the substantial factor test: was the defendant's conduct a substantial factor in bringing about plaintiff's harm?" *Morales v. Am. Honda Motor Co.*, 71 F.3d 531, 537 (6th Cir. 1995). In other words, for this claim, was any failure to warn by TenPoint (assuming for the sake of argument that there was such a failure) a substantial factor in bringing about Queen's harm; that is, was that failure the legal cause of Queen's injury?

"Causation is an element which may be proved by circumstantial evidence, and in that situation 'the evidence must be sufficient to tilt the balance from possibility to probability.'" *Id.* (quoting *Calhoun v. Honda Motor Co.*, 738 F.2d 126, 130 (6th Cir. 1984)). Although proximate cause is generally a fact for a jury, the record here supports summary judgment in TenPoint's favor on this claim.

TenPoint argues that, prior to his injury, Queen knew and understood, despite never having been warned, that a finger in the path of a firing crossbow string could be injured and, in fact, believed that was just "common sense[.]" (Mot. at 358 (citing Queen Dep. at 376 (47–48)).) Therefore, according to TenPoint, no warning, even a warning placed directly on the crossbow (as opposed to on a tag or in a user's manual) would have prevented Queen's injury from the standpoint of his failure to warn claim.

In opposition, Queen argues that he "did not understand or appreciate the risk that his thumb could inadvertently migrate into the flight deck even properly holding the bow." (Opp'n at 535.) As record support for this argument, he cites to the following passage from the deposition of his expert, Brian O'Donel:

> Q. You would agree with me that the risk of injury of your thumb or fingers coming into the path of the string on a crossbow is open and obvious, it's pretty much common sense; true?
>
> A. No, I wouldn't say that. I think from me being in a position of knowledge, it is certainly a recognized hazard. It may not be appreciated fully by all users, maybe not even the average user.

(O'Donel Dep. at 764 (77).) But O'Donel's testimony does not trump Queen's and Queen said he did have that knowledge and did appreciate the danger. Further, O'Donel's testimony must be read in its full context. The questioning continued as follows:

> Q. Would you agree with me that if the plaintiff[ ] . . . admit[s] that the hazard that is being warned of was common sense and [he] appreciated the hazard even without reading any warnings, that whatever warnings would have been provided would have been irrelevant at that point?
>
> A. . . . To some extent, I would have to answer yes. Not have to, but I would agree with you that if they do understand the hazard, how to avoid the hazard, the consequences of not avoiding the hazard, to some extent the warnings are not going to prevent. I would agree with that, which is why they are in a lower order of protection and the safeguarding is so important.
> And the absence of the safeguarding is a defect that was the cause of these injuries.
> From what I read, I do believe that [the plaintiff] at least knew that if [he] got [his] thumb in the flight track, there could be consequences to it.
> I cannot speak to [his] level of appreciation of that. But given that fact pattern, the warnings likely would not have prevented.
> It would be my opinion that TenPoint should have put on product warnings that met the ANSI standard, but I can't say that if they would have done that these injuries would have been prevented.

(*Id.* at 765 (78).)

Perhaps Queen did not know or apprehend the *location* of his finger at the time of the accident; but he *did* know that a finger in the flight path or on the flight deck of the crossbow would be injured. He testified as follows:

> Q. You would agree with me that it was your placement, accidentally, inadvertently, of your thumb and forefinger above the flight deck in the path of the string that caused this accident, true?[10]
>
> A. If my thumb had been clear of the string, it wouldn't have been injured.
>
> Q. True. And the, you're the individual that placed your finger and thumb in the path of the string?
>
> A. Correct.

(Queen Dep. at 392 (109) (footnote added).) Queen's belated argument that, without a proper warning, he could not have appreciated that his finger could inadvertently move into the flight path and/or flight deck is inconsistent with his testimony.[11] During his deposition, Queen was shown the 2009 Owner's Manual that would have accompanied the crossbow when it was first purchased. There is no dispute that Queen never saw this manual prior to his injury. But he testified as follows:

> Q. If you would turn to the second page of the document, please. On the right-hand side is essentially a page that says "Safety Instructions." Do you see that?
>
> A. Yes, ma'am.
>
> Q. And do you see the photographs at the top of the page showing improper placement of one's hand on a crossbow?
>
> A. Yes, ma'am.

---

[10] Plaintiff's counsel objected to the form of this question.

[11] Queen is arguing that he had no idea that "his thumb could inadvertently rise into the string path, even when he otherwise thought he was holding the crossbow properly." (Opp'n at 533.) He tries to convert this into a failure to warn by arguing that, lacking any warning, he could not "appreciate" the danger. This is not a failure to warn argument; it is a design defect argument.

> Q. All right. And even without that instruction, you knew and appreciated the fact that you wouldn't want to place your hands in that position because of the danger of the contact with the string?
>
> A. Yes.
>
> Q. And it also shows you the proper hand position, true?
>
> A. Yes.
>
> Q. In the bigger photo in the middle of the page, true?
>
> A. Yes.
>
> Q. And if you look to the left of page 2, at page 1 over under "Caution," the second bold paragraph under the "Caution" section says, "Never allow your fore-grip hand's fingers or thumb to move above the barrel's flight deck or into the bow string or cables' release path (photos 1, 2, 3 & 4). If you do, you will injure yourself severely when you fire your crossbow."
> Did I read that correctly?
>
> A. Yes.
>
> Q. And that's something you knew and appreciated, true?
>
> A. Yes.

(*Id.* at 383 (74–75).)

Given Queen's own clear testimony, there is no reason to conclude that a warning—even an "on-product" warning (Opp'n at 536)—would have prevented the inadvertent placement of his finger that resulted in his injury.

TenPoint is entitled to summary judgment in its favor on Queen's failure to warn claim under both strict liability and negligence.

### 3. Design Defect Claim

"To support a design defect product liability claim, under either theory of negligence or strict liability, a plaintiff must show that the product was in a defective condition unreasonably

dangerous to the user or consumer as designed." *Hinkle v. Ford Motor Co.*, Civil Action No. 3:11-24-DCR, 2012 WL 5868899, at *2 (E.D. Ky. Nov. 20, 2012) (quotation marks and footnote omitted). But "proof that technology existed, which if implemented would feasibly have avoided a dangerous condition, does not alone establish a defect." *Brock v. Caterpillar, Inc.*, 94 F.3d 220, 224 (6th Cir. 1996) (quoting *Sexton v. Bell Helmets, Inc.*, 926 F.2d 331, 336 (4th Cir. 1991) (interpreting Kentucky law)). In addition, a plaintiff must establish "more than that a particular injury would not have occurred had the product which caused the injury been designed differently." *Jones v. Hutchinson Mfg., Inc.*, 502 S.W.2d 66, 70 (Ky. Ct. App. 1973).

Interpreting the meaning of "defective condition unreasonably dangerous," the Kentucky Supreme Court held that "the question is whether the product creates 'such a risk' of an accident of the general nature of the one in question 'that an ordinarily prudent company engaged in the manufacture' of such a product 'would not have put it on the market.'" *Montgomery Elevator Co. v. McCullough*, 676 S.W.2d 776, 780 (Ky. 1984) (quoting *Nichols*, *supra*).

> Considerations such as feasibility of making a safer product, patency of the danger, warnings and instructions, subsequent maintenance and repair, misuse, and the products' inherently unsafe characteristics, while they have a bearing on the question as to whether the product was manufactured "in a defective condition unreasonably dangerous," are all factors bearing on the principal question rather than separate legal questions.

*Id.* at 780–81.

TenPoint argues that Queen is unable to meet his burden of proving that the crossbow was "unreasonably dangerous." It asserts that "[t]he thrust of [p]laintiff's design defect claim is that the subject crossbow was defective, because when it was manufactured in 2009 it did not come with a guard to keep [p]laintiff's fingers from migrating into the path of the moving bowstring." (Mot. at 360.) TenPoint claims that, in 2009, no crossbow manufacturer included a guard of any

kind and, in fact, TenPoint was the industry leader when, in 2005, it "conceived of the idea of a detachable grip guard and applied for a patent for the concept." (*Id.*) TenPoint cites *Jones*, 502 S.W.2d at 69, and *McKee v. Cutter Labs., Inc.*, 866 F.2d 219, 224 (6th Cir. 1989) for the proposition that "[u]nder Kentucky law, compliance with industry custom is evidence of non-negligence[.]" (Mot. at 360.)[12]

In opposition, Queen merely argues that TenPoint "recognized the need for guarding, had applied for a patent in 2005 for the very guarding that would have prevented Queen's injury, and even provided finger guarding on one line of crossbows at least three years prior to the date [p]laintiff's crossbow was manufactured." (Opp'n at 537.) He claims that "[t]he cost of safety wings was negligible, and their inclusion would not have affected the crossbow's performance." (*Id.*) Queen claims that "[t]o date, <u>all</u> TenPoint crossbows have integrated safety rails, or safety wings, along the stock of all crossbows[]" and "a warning sticker is placed on top of all of TenPoint's safety wings." (*Id.*) He claims that all of this creates a question of fact that precludes summary judgment on design defect.

In reply, TenPoint properly argues:

[T]he issue here is not whether [p]laintiff's accident would have been prevented if the subject crossbow had included a GripGuard™ or some other guard back in 2009. Rather, the issue is whether an ordinarily prudent company engaged in the manufacture of crossbows would have put the subject crossbow on the market.

(Reply at 1075.) TenPoint notes that "[p]laintiff's own expert concedes that the subject crossbow complied with industry custom." (*Id.* at 1076.[13]) And Queen does not dispute that, under Kentucky law, compliance with industry standards in 2009 is evidence that the crossbow is reasonably safe.

---

[12] But the court in *McKee* also stated that, although this "is evidence for the defendant, . . . it is not always conclusive." *McKee*, 866 F.2d at 224 (citing *Jones*).

[13] O'Donel specifically testified that he was "not saying that TenPoint failed to do what others in the crossbow industry were doing[.]" (O'Donel Dep. at 792 (187).) But, in his view, a guard of some sort was "feasible and available" and

17

Queen, in fact, agrees that TenPoint was not required to make the *safest* product, so long as the product was not *unreasonably* dangerous. (Opp'n at 536.) Queen does not cite any authority suggesting that TenPoint's subsequent invention of new safety features not available on the subject crossbow is evidence that the crossbow was defectively designed. In fact, "feasibility of making a safer product does not compel a finding that an existent product is unreasonably dangerous." *Walker v. Phillip Morris USA Inc.*, 610 F. Supp. 2d 785, 788 (W.D. Ky. 2009), *vacated and remanded on other grounds by* 443 F. App'x 946 (6th Cir. 2011).

TenPoint cites to several cases in support of its position that, "with or without a [guard], the danger presented by allowing one's thumb to migrate up into the path of a crossbow string is so obvious that it is unreasonable to place the blame for [p]laintiff's injury on TenPoint." (Mot. at 361.) First, in *Jones*, *supra*, the court determined that the danger presented by an operating grain auger, with unprotected metal blades moving at high speed, was so apparent that, as a matter of law, the manufacturer could not be blamed for the injury to a child playing near the auger. 502 S.W.2d at 70 ("The manufacturer adopted a design to minimize danger and still accomplish the work"). Second, in *Hercules Powder Co. v. Hicks*, 453 S.W.2d 583, 587 (Ky. Ct. App. 1970), the court held that "any normally intelligent person would realize the dangerous characteristics of dynamite." Third, in *Byler v. Scripto-Tokai Corp.*, Nos. 90-6112 & 90-6113, 1991 WL 181749, at *4 (W.D. Ky. Sept. 17, 1991), the court held that a butane lighter used by a child to start a fire, resulting in his injury, was not defective because "[i]t is common knowledge that children can cause fires with lighters." The court concluded: "as the auger in *Jones* was held not to be

---

"*should* have [been] done[.]" (*Id.* (188) (emphasis added).) O'Donel was "not able to identify . . . another crossbow manufacturer in 2009 who provided what [he has] characterized as adequate safeguarding for a crossbow that TenPoint didn't provide[.]" (*Id.* (189).)

unreasonably dangerous, so too should the lighter here be held not to be unreasonably dangerous." *Id.* at *4. Finally, in *Sturm, Ruger & Co. v. Bloyd*, 586 S.W.2d 19 (Ky. 1979), where a worker cleaning a gun owner's car was injured when a revolver the owner placed under the floor mat discharged, the court held that "[a] gun, although inherently dangerous, does not come within the category of those substances or chattels which, by their very nature, are not only inherently dangerous but unsafe for general use. . . . The dangerous propensity of the revolver was a condition rather than a cause." *Id.* at 22.

It is Queen's burden to show that his crossbow was unreasonably dangerous, *i.e.*, defective, when it left TenPoint's control. Even though a crossbow is undoubtedly inherently dangerous, that does not mean it is inherently defective. Notably, if the manufacturers of inherently dangerous products such as grain augers and butane lighters cannot be held liable on a design defect theory when *children* are injured, surely *Queen* can be held to the same standard of knowledge with respect to the inherent dangerousness of putting one's finger in the path of an operating crossbow string. In fact, Queen possessed that knowledge, which is not surprising, given that it is common knowledge, obvious, and, in his words, "common sense."

While it is unfortunate that Queen placed his thumb in the path of the crossbow string when he chose to de-cock the crossbow by shooting a practice arrow into the ground in his backyard, TenPoint cannot be liable for Queen's careless use of its product. Although the crossbow was an inherently dangerous product, it was not defectively designed.

## IV. CONCLUSION

For the reasons set forth herein, the motion for summary judgment of defendant Hunter's Manufacturing Company, Inc., d/b/a TenPoint Crossbow Technologies, is **granted**.

**IT IS SO ORDERED**.

Dated: December 31, 2018

                                                         **HONORABLE SARA LIOI**
                                                         **UNITED STATES DISTRICT JUDGE**